# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

| | | |
|---|---|---|
| County of Delaware, Pennsylvania, Appellant | : | |
| | : | |
| | : | |
| v. | : | No. 148 C.D. 2021 |
| | : | |
| Delaware County Regional Water | : | |
| Quality Control Authority, and | : | Argued: October 18, 2021 |
| DELCORA Rate Stabilization Fund | : | |
| Trust Agreement b/t The Delaware | : | |
| County Regional Water Quality | : | |
| Control Authority as Settlor and | : | |
| Univest Bank and Trust Co. as | : | |
| Trustee | : | |
| | : | |
| v. | : | |
| | : | |
| Darby Creek Joint Authority, Southern | : | |
| Delaware County Authority, and Aqua | : | |
| Pennsylvania Wastewater, Inc. | : | |

BEFORE:　HONORABLE PATRICIA A. McCULLOUGH, Judge
　　　　　HONORABLE MICHAEL H. WOJCIK, Judge
　　　　　HONORABLE BONNIE BRIGANCE LEADBETTER, Senior Judge

OPINION BY
JUDGE McCULLOUGH　　　　　　　　　　　　　FILED:　March 3, 2022

　　　　　The County of Delaware (County) appeals from the December 28, 2020 final order of the Court of Common Pleas of Delaware County (trial court), which was entered following a bench trial and disposed of all claims filed by the County and counterclaims filed by Delaware County Regional Water Quality Control Authority (DELCORA) and Aqua Pennsylvania Wastewater, Inc. (Aqua).

Recently, in *In re Chester Water Authority Trust*, 263 A.3d 689 (Pa. Cmwlth. 2021) (*en banc*),[1] this Court reconfirmed that a municipality, per section 5622(a) of the Municipality Authorities Act (MAA),[2] 53 Pa.C.S. §5622(a),[3] possesses the unilateral power to dissolve and/or obtain an authority that it had created or the authority's assets. The major issue in this appeal is whether a municipality (here, the County) can exercise that statutory power after an authority (here, DELCORA), acting pursuant to section 5607(d)(4) and (13) of the MAA, 53 Pa.C.S. §5607(d)(4), (13),[4]

---

[1] *Petition for allowance of appeal pending* (Pa., Nos. 519-522 MAL, filed September 17, 2021, and 569-572 MAL 2021, filed October 18, 2021).

[2] 53 Pa.C.S. §§5601-5623.

[3] Titled "[c]onveyance by authorities to municipalities or school districts of established projects," section 5622(a) of the MAA presently states as follows:

> (a) *Project.***--**If a project established under this chapter by a board appointed by a municipality is of a character which the municipality has power to establish, maintain or operate and the municipality desires to acquire the project, it may by appropriate resolution or ordinance adopted by the proper authorities signify its desire to do so, and the authorities shall convey by appropriate instrument the project to the municipality upon the assumption by the municipality of all the obligations incurred by the authorities with respect to that project.

53 Pa.C.S. §5622(a).

[4] Section 5607(d)(4) and (13) provides as follows:

> (d) *Powers.*--Every authority may exercise all powers necessary or convenient for the carrying out of the purposes set forth in this section, including, but without limiting the generality of the foregoing, the following rights and powers:
> . . . .
> (4) To acquire, purchase, hold, lease as lessee and use any franchise, property, real, personal or mixed, tangible or intangible, or any interest therein necessary or desirable for carrying out the purposes of the

**(Footnote continued on next page…)**

entered a contract to sell its assets to a private third party (here, Aqua).  Given the underlying factual circumstances, this issue arises specifically at a point where the obligations of the contract have not been fully performed, the contract is subject to a condition subsequent, the municipality arguably did not assume the obligations of the contract via an ordinance, and the municipality—disputedly—cannot fulfill the obligations of the authority in the event the municipality did assume the contract.

Upon review, we conclude that the County retains its statutory authority under section 5622(a) of the MAA, notwithstanding DELCORA's exercise of power under section 5607(d)(4) and (13) of the MAA.  Accordingly, we reverse the order of the trial court and remand for further proceedings.

## Background

In its opinion, the trial court set forth the factual history of this case as follows:

> DELCORA is a municipal authority formed by the County pursuant to the [MAA] of 1945[5] for the purpose of collecting, conveying, and treating wastewater generated by residents and businesses located in the County.  On October 20, 1971, the County . . . created DELCORA by filing Articles of Incorporation . . . with the Department of State.

---

> authority, and to sell, lease as lessor, transfer and dispose of any property or interest therein at any time acquired by it.
> . . . .
> (13) To make contracts of every name and nature and to execute all instruments necessary or convenient for the carrying on of its business.

53 Pa.C.S. §5607(d)(4), (13).

[5] Act of May 2, 1945, P.L 382, No. 164, *as amended*, *formerly* 53 P.S. §§301-322.  Later, section 3 of the Act of June 19, 2001, P.L. 287 (2001 Act), repealed the MAA of 1945 and replaced it with the current MAA.

The County is the only municipal incorporator of DELCORA. The County is governed under its Home Rule Charter and consists of five elected council members. The original Articles provide that DELCORA[]

> shall be organized for the purpose only to acquire, hold, construct, improve, maintain, operate, own and lease, either in the capacity of lessor or lessee, projects of the following kind and character: sewers, sewer systems or parts thereof, sewerage treatment works, including works for the treating and disposing of industrial waste, in and for the County, and such other territory as it may be authorized to serve, and to contract with individuals, corporations, municipal corporations, authorities, and other governmental bodies or regulatory agencies both within and without the County [], and shall exercise all of the powers granted to an Authority organized for such purpose by the [MAA] of 1945 under which it is organized.

The Articles were subsequently amended by the County through the filing of Articles of Amendment on November 9, 1977, to increase the number of board members of DELCORA from seven to nine. On April 16, 2002, the Articles were again amended to extend the term of existence of DELCORA from October 20, 2021, to January 15, 2052.

DELCORA currently owns, operates, and maintains wastewater collection systems that serve approximately a half million people in [42] municipalities in both Delaware and Chester Counties. DELCORA is responsible for building and operating interceptors, force mains and pump stations, [] a regional wastewater treatment plant, and acquiring treatment capacity from the Philadelphia Water Department. DELCORA also currently owns and operates sewer collection systems serving eight municipalities: the City of Chester [(City)], parts of the Township of Chester, and the Boroughs of Parkside, Upland, Trainer, Marcus Hook, Rose Valley, and Edgemont. In addition, DELCORA owns and operates two treatment plants in Pocopson Township, Chester County. Intervenors Darby Creek Joint Authority [(DCJA)] and Southern Delaware County Authority [(SDCA)] both have service contracts with

4

DELCORA and rely upon DELCORA's wastewater collection and treatment, as they represent various communities themselves.

In 2019, when faced with dramatically increasing estimated capital costs that would substantially increase rates that would have to be charged to its customers, DELCORA engaged in discussions with [i]ntervenor [Aqua], a provider of wastewater utility service in Pennsylvania, for the purchase of DELCORA's system. At its regularly scheduled meeting on September 17, 2019, the DELCORA Board unanimously approved a $276.5 million sale to [Aqua]. The Asset Purchase Agreement [(APA)] is dated September 17, 2019, and was subsequently amended on February 24, 2020. The [APA] is structured in such a way as to protect DELCORA's customers by capping all rate increases for customers at 3% per year. Through a separate DELCORA Trust Agreement, known as the Rate Stabilization Fund Trust [(the Trust, Trust Agreement, or Rate Stabilization Fund Trust)], DELCORA agreed to place the proceeds of the sale (after paying down DELCORA's obligations) into an independently managed irrevocable trust for the benefit of DELCORA's customers, with Intervenor Univest Bank and Trust Co. serving as trustee [(Univest)]. [Aqua] is identified as a third-party beneficiary under the [] Trust Agreement.

As a municipal authority that is governed by the [MAA], DELCORA has all the rights, powers, and duties that are set forth in the [MAA], including the right and power to sell its system to an investor[-]owned utility such as [Aqua]. The [APA], dated September 17, 2019, was properly authorized and properly entered into by DELCORA in full compliance with the law and the [MAA], at a public meeting and constitutes a binding, enforceable agreement and contractual obligation of DELCORA.

The [APA] contains multiple provisions which in effect mandate that DELCORA proceed to closing on the sale to [Aqua] prior to any dissolution of DELCORA by the County.

5

There are provisions in the APA that can only be satisfied by DELCORA prior to closing, and not the County, as evidenced by [certain,] relevant provisions of the APA.[6,7]

---

[6] Reproduced in a somewhat reworded and summarized form, the trial court commented upon the pertinent provisions of the "Representations & Warranties" section of the APA as follows: (1) Article IV, introductory language—DELCORA makes its representations and warranties "as a material inducement" to Aqua to enter into and consummate the transactions contemplated by the APA; (2) Section 4.06—DELCORA must confirm that there are no undisclosed liabilities for the system as of closing; (3) Section 4.09—The APA involves hundreds of distinct interests in real property and the ongoing searches may reveal many more. DELCORA is required to confirm at closing that Aqua is getting all of its real property interests, and only DELCORA will have knowledge regarding whether disclosure of real property interests is accurate and complete; (4) Section 4.13—DELCORA's environmental representations and warranties are critical to the APA, and the County, if it was permitted to dissolve DELCORA prior to closing, will be unable to determine whether the representations and warranties remain true and correct at closing. Further, Aqua agreed to allow DELCORA to make several representations and warranties subject to DELCORA's knowledge of the conditions covered in those specific representations and warranties, which the County would be unable to make; (5) Section 4.14—The transaction requires that DELCORA's permits be transferred; however, there is no indication that the County is prepared or would be permitted to assume the Department of Environmental Protection (DEP) permits that are required to operate this system; (6) Section 4.15—The transaction requires the assignment of approximately 200 service contracts (many of which require the consent of the parties), all consents secured thus far were based upon the understanding that the provision of service would be transferred from DELCORA to Aqua, and the County is in no position to honor some of the obligations that were made; (7) Section 4.17(b)—This section mandates assurances that the assets Aqua agreed to buy are sufficient to operate the system, and the County would be unable to make this representation at closing; (8) Section 9.03—This section requires DELCORA to update representations and warranties within 3 days of becoming aware of information that implicates a disclosure, which DELCORA alone would know; and (9) Section 12.02—DELCORA must certify at closing that the representations and warranties made as of the date the parties signed the APA remain true and correct as of the date of closing, but the County, due to lack of knowledge, is not in a position to make that closing certification, and, as a result, the closing itself would be jeopardized or Aqua would be forced to decide whether to terminate the APA or accept an insufficient closing certification. (Trial court op. at 5-6.)

[7] Replicated in a relatively more succinct fashion, the trial court analyzed the remaining portions of the APA that it deemed to be relevant to this case as follows: (10) Section 7.06—This provision makes closing contingent upon approval by the Pennsylvania Public Utility Commission (PUC). Because customers exist outside of the County, the County would need to secure a first PUC approval to obtain DELCORA's assets and, then the subsequent sale to Aqua, would require a second PUC approval, which could nullify the pending PUC application to approve the sale directly from DELCORA to Aqua and threaten the closing date; (11) Section 9.01—This section requires **(Footnote continued on next page…)**

The [APA] is subject to [PUC] approval, which is the subject of an application filed by Aqua that is pending before the PUC at Docket No. A-2019-3015173 [(PUC Application)].

On or about December 18, 2019, the County amended DELCORA's Articles to add the following to the "purpose" provision:

In anticipation of the dissolution of [DELCORA] and/or the transfer and sale of all or substantially all of [DELCORA's] assets, property, and projects in exchange for the receipt of a cash payment, [DELCORA] and its Board, in addition to any other authority granted by applicable law, shall have the full authority, without limitation to: (1) establish a trust or non-profit entity to exist for the benefit of rate payers to distribute to rate payers some or all of the proceeds received from any transfer and sale, in accordance with applicable law and any agreements concerning the transfer and sale of any assets and/or [DELCORA's] dissolution; and (2) execute any necessary agreement to effectuate this purpose prior, during or after any transfer and sale and/or dissolution.

According to the Amended Articles, assets of a trust or non-profit entity will be distributed to the rate payers for the purpose of "Rate Stabilization." On December 27, 2019, the [Rate Stabilization Fund] Trust between DELCORA, as Settlor, and [Univest], as Trustee, was created. . . . The stated purposes of the Trust are "to benefit the Beneficiaries[,

DELCORA to operate the system in the ordinary course between signing and closing, and DELCORA credibly alleges that the County has no ability to do so here; (12) Sections 8.01/8.02—DELCORA's representations and warranties survive closing for a full year, and the County would be at risk of an indemnity claim for that full amount in the event the County assumed the obligations of the representations and warranties; (13) Section 8.05(c)—With certain exceptions, Aqua agreed to cap DELCORA's post-closing indemnity obligation for failed representations and warranties at 5% of the purchase price and, if Aqua had known that it would have to go to closing with the County, Aqua never would have agreed to cap its post-closing indemnity right; (14) Section 15.09—The County's intended action with DELCORA would qualify as an assignment of DELCORA's rights and obligations under the APA and would thus require Aqua's consent; and (15) Section 15.11—The parties have a right of specific performance under this APA. (Trial court op. at 6-7.)

7

defined as DELCORA's customers,] by receiving Sale Proceeds deposited into the Trust Fund by [DELCORA] and any additional contributions made to the Trust under [s]ection 3.3 [, which refers to other contributions in the form of cash, securities, or other property acceptable to Univest, including funds released from Escrow Accounts related to the sale to Aqua]."

On May 19, 2020, the County published and passed Ordinance No. 2020-4 [(Ordinance)] at a special Zoom [video conference] meeting on June 3, 2020. On June 3, 2020, the County approved and enacted [the] Ordinance [], directing and ordering DELCORA to terminate its operation, wind up its affairs, satisfy outstanding debts, and take all actions necessary to remove any impediments to its termination, and refrain from taking any action or expending any funds inconsistent with DELCORA's termination of its affairs[.]

Within [24] hours of the County adopting [the] Ordinance [], the County Solicitor sent a letter to DELCORA on June 4, 2020, which, in part, states and directs that DELCORA is

> to take all actions necessary to effectuate its termination . . . and take all steps necessary to effectuate the transfer of all its assets, funds, and other property [to the County] . . . . The County strongly cautions [DELCORA] against approving any course of action or expenditure of funds that is inconsistent with termination, such as incurring additional debt, transferring assets to the illegally created Rate Stabilization Fund Trust, or entering into long-term contracts, without the express authority of the County.

The County Solicitor's letter further cautions [DELCORA] that "any expenditure of funds by [DELCORA] that is contrary to the directives and objectives of the County in the Ordinance is a violation of the restrictions on the expenditure of funds of [DELCORA]." The letter from the County Solicitor, Mr. William F. Martin, directs that "[DELCORA] is hereby directed to cease any activities—and the expenditure of any funds in connection with such activities—

8

that are contrary to the County's directives as set forth in the Ordinance."

(Trial court op. at 3-10) (internal citations and footnotes omitted).

In this factual context, the County filed a complaint on May 14, 2020, and later an amended complaint, seeking among other forms of relief, a writ of mandamus. Thereafter, DELCORA, Aqua, and two other intervenors filed answers and counterclaims. The case then proceeded through a somewhat complex procedural history, which involved or resulted in multiple orders by the trial court, a bench trial on the merits on some of the claims, and procedural issues regarding the filing of post-trial motions. *See* Trial court op. at 2 n.1, 10-16. After conducting a bench trial, the trial court, in short, concluded that the APA was valid and enforceable, and the County lacked the authority under section 5622(a) of the MAA to interfere with DELCORA's contractual duties to perform under the APA. The trial court further concluded that the County did not—and could not—assume the contractual obligations of DELCORA under the APA. As such, the trial court issued an injunction against the County to this effect, and, in so doing, effectively nullified the Ordinance and the County's attempt to dissolve and/or obtain the assets of DELCORA. Based on these conclusions, the trial court denied the County's request for a writ of mandamus.

In its statement of errors complained of on appeal, the County raised five (yet, in some instances, theoretically overlapping) issues for the trial court's consideration. More specifically, the County asserted that the trial court erred in (1) failing to enter a writ of mandamus compelling DELCORA to comply with the Ordinance; (2) assuming jurisdiction to decide the validity of the APA because exclusive jurisdiction resides with the PUC; (3) concluding that DELCORA and Aqua met the standards for injunctive relief; (4) determining that the Rate Stabilization Fund

Trust was valid and enforceable; and (5) prohibiting the County from introducing evidence as to whether the APA violates public policy.

Relevant here, the trial court disposed of the County's first issue, and its related subsidiaries and corollaries, with the following reasoning:

> The fundamental issues of this case are the legality, enforceability, and integrity of a contract, that being the [APA] between DELCORA and Aqua, the enforcement of the Ordinance and the County's actions in opposing and interfering with DELCORA's performance of the same contract, and the legality and funding of the Rate Stabilization Fund Trust between DELCORA and Aqua. The enforcement of legally binding contracts is the foundation of our law. When a county government is a party to a legally binding contract, the change of governmental administration, management, or political persuasion may create the desire to renegotiate or not renew nor extend a contract; but when there is, as there is here, an alleged intentional interference, termination, or obstruction of a legally binding contract, that requires critical judicial examination.
>
> . . . .
>
> Clearly, by way of enforcing the Ordinance, the County directs the termination, or as the County refers to it, the "winding down" of DELCORA. This Court found that the Ordinance does more than "wind down" DELCORA; rather, it imploded DELCORA's ability and obligations to perform contractual obligations to effectuate the sale. The directives, terms, and provisions of the County's June 3, 2020 Ordinance [], as demonstrated by the County Solicitor's Letter dated June 4, 2020, and public rhetoric with strong political overtones, evidences the County's intent and design to thwart, reverse, interfere, and extinguish the contractual agreements and a contract[, *i.e.*, the APA,] which was previously publicly debated, considered, and legally adopted by DELCORA, Aqua, and the County.
>
> . . . .

10

[T]his Court found that section 5607 of the [MAA] permits DELCORA to enter into such a contract, while also finding that the contract terms were still subject to the approval of the [PUC].

Aqua had and has a fully binding and enforceable agreement to acquire DELCORA's system, which requires the representations and warranties that can only be made by DELCORA. [*See supra* notes 5-6.] Contracts, binding agreements, and various legally public actions are not to be extinguished or interfered with merely because of a reorganization of any County Council or partisan differences. The integrity and predictability of contracts when legally adopted should be relied upon by the parties, for this represents good public policy, and the County shall hereby provide full faith and credit to the [APA], even as [the] County administrations may change[.]

(Trial court op. at 19-21.)

Specifically addressing its denial of the County's request for a writ of mandamus and decision granting DELCORA injunctive relief, the trial court provided the following rationale to support its rulings:

The County requested that the Ordinance be declared valid and enforceable and requested a writ of mandamus to DELCORA to comply with the Ordinance [] and cooperate with termination; this Court disagreed with the position and arguments of the County.

By way of enforcing the Ordinance, the County directed the termination of DELCORA, which this Court determined directly and immediately interfered with [] DELCORA's ability to perform [the APA's] contractional obligations to effectuate the sale and further interferes with Aqua's contractual rights. This Court notes that the Ordinance provides for the assumption of all DELCORA's liabilities by the County but does not provide an assumption of the obligations.

. . . .

11

The requirements contained in the County's Ordinance of dissolution and termination and the County Solicitor's June 4, 2020 letter directs that DELCORA immediately provide a Certificate of Termination, and places restrictions on expenses and constraints on the actions and performance required of the [APA], which is the functional equivalent to termination and interference of contractual obligations, as well as essential services, and imposes and creates immediate and irreparable harm. Various terms and conditions of the Ordinance are a substantial obstacle to DELCORA and Aqua's performance of contract, and the County has not removed any impediments to the termination of DELCORA. Under [section 5622(a) of] the MAA, the County was required to assume "all the obligations incurred" by DELCORA prior to the termination, and that is not what the County sought in this case. [The County has] taken no steps to remove the existing impediments while, at the same time, has consistently required a Certificate of Termination from DELCORA.

. . . .

[T]he Ordinance fails to address the impediments that exist and must be resolved prior to the termination of DELCORA. Numerous debts and financial obligations must be met prior to the termination of DELCORA, debts and obligations which at this time DELCORA is unable to sufficiently fund, and of which the County has provided no steps to provide DELCORA with any direction as to how DELCORA can remove [these] impediment[s] [and discharge] its debts. As the APA has been found to be binding and valid, it is hence an obligation of DELCORA, and the County must assume it in order to terminate DELCORA and, as such, [the APA] is an impediment to the termination.

(Trial court op. at 25-30.)

12

On appeal, the County reiterates the arguments that it made in its statement of errors, contending, among other things, that the trial court erred in failing to enter a writ of mandamus compelling DELCORA to comply with the Ordinance.

**Whether the County's Ordinance Complies with—and is Valid and Enforceable under—Section 5622(a) of the MAA despite DELCORA's Exercise of the Power to Contract pursuant to Section 5607 of the MAA[8]**

The County argues that, pursuant to section 5622(a) of the MAA, it has the unfettered and unilateral right to terminate/dissolve DELCORA without DELCORA's consent and to mandate that DELCORA remove any "impediments" to its termination/dissolution. The County, citing and quoting provisions of the Ordinance, also contests the trial court's determination that the Ordinance was invalid because it did not include any express provision for the assumption of DELCORA's contractual obligations as required by section 5622(a) of the MAA.

With regard to *In re Chester Water Authority Trust*, the County contends that our decision "makes abundantly clear that the powers of the incorporating municipality to acquire an authority and its assets under section 5622(a) of the MAA are paramount, and superior to, any independent powers that an authority possesses under the MAA," including an authority's power to transfer its assets to another entity pursuant to section 5607(d)(4) and (13) of the MAA. (County's Suppl. Br. at 7.) The County maintains that in *In re Chester Water Authority Trust*, this Court's "analysis acknowledge[d] the structural distinction between the powers of municipalities and the authorities they have created." *Id.* For support, the County cites a passage from the

---

[8] On October 6, 2021, this Court entered a *per curiam* order granting the County's application for leave to file a supplemental brief in light of our recent decision in *In re Chester Water Authority Trust*. The County, DELCORA, and Aqua have all filed supplemental briefs to address whether *In re Chester Water Authority Trust* has any impact on this issue.

opinion, which states that "just because an authority may transfer its assets to other governmental entities, as part of its daily operational affairs under other sections of [the MAA], *this does not mean that an authority possesses the same and sole power under section 5622(a)* of the MAA." *Id.* at 6-7 (quoting *In re Chester Water Authority Trust*, 263 A.3d at 704) (emphasis in brief). At bottom, the County views our decision in *In re Chester Water Authority Trust* as marking a distinguishing line between the statutory powers associated with an authority's operational affairs, such as the contracting and selling of assets per section 5607(d)(4) and (13) of the MAA, and a municipality's authority, via section 5622(a), "to dissolve an authority and obtain and later transfer and/or convey the authority's assets *as it deems fit*, without any input on the part of the authority." *Id.* at 8 (quoting *In re Chester Water Authority Trust*, 263 A.3d at 700) (emphasis in brief).

In response, DELCORA and Aqua argue that the APA is a legitimate exercise of DELCORA's authority under section 5607(d)(4) and (13) of the MAA and constitutes a binding and enforceable contract. They contend that the County, through the enactment of the Ordinance, seeks to thwart and essentially violate the terms and conditions of the APA, thereby intentionally interfering with their contract. Apparently in the alternative, DELCORA and Aqua assert that the Ordinance failed to expressly assume DELCORA's debts and obligations and, thus, failed to satisfy the preconditions needed for the County to obtain DELCORA's assets under section 5622(a). In addition, DELCORA and Aqua maintain that the County, even if it had explicitly assumed the contractual obligations in connection with the APA, lacks the capabilities to perform them and this serves as an "impediment" to the County's usage of power pursuant to section 5622(a). *See supra* notes 5-6.

14

DELCORA and Aqua further assert that *In re Chester Water Authority Trust* has no bearing on or relevance to the issue presented here. They argue that *In re Chester Water Authority Trust* only addressed the interplay between sections 5622(a) and 5610(a.1) of the MAA, 53 Pa.C.S. §5610(a.1.),[9] and ultimately issued a "narrow" holding, to wit, that section 5610(a.1) "did not abrogate, supersede, or otherwise alter a municipality's longstanding power under section 5622(a) and its statutory predecessors to unilaterally obtain an authority and/or its assets." (Aqua's Suppl. Br. at 3) (quoting *In re Chester Water Authority Trust*, 263 A.3d at 692.) To buttress its point, DELCORA notes that the present case does not involve section 5610(a.1) of the MAA in any manner and quotes the following passage from *In re Chester Water Authority Trust*:

> [W]e accepted one issue, and only one issue, for review: whether section 5610(a.1) of the MAA mandates that the City [of Chester (City)], the County of Chester, and the County of Delaware, as the "governing body" of the [Chester Water Authority (Authority)], approve a transfer of the Authority's assets to the City, or whether the City, pursuant to section 5622(a) of the MAA, can obtain the Authority and its assets without the approval of the Authority or its "governing body."

---

[9] In 2012, "the General Assembly passed Act 73 of 2012, which added subsection (a.1) to section 5610 of the MAA." *In re Chester Water Authority Trust*, 263 A.3d at 692. Succinctly, this statutory provision effectively added members to a board of an authority where "a water or sewer authority incorporated by one municipality provides water or sewer services to residents in at least two counties and has water or sewer projects in more than two counties." 53 Pa.C.S. §5610(a.1). In such a situation, "the powers of each authority shall be exercised by a board composed of . . . [t]hree members appointed by the governing body from each county in which the services to residents are provided" and "[t]hree members appointed by the governing body of the incorporating municipality." 53 Pa.C.S. §5610(a), (a.1)(1)(i)-(ii). This composition of a water/sewer authority's board stands in contrast to the scenario where an "authority is incorporated by one municipality," in which case "the board shall consist of a number of members, not less than five, as enumerated in the articles of incorporation." 53 Pa.C.S. §5610(a)(1).

15

(DELCORA's Suppl. Br. at 3) (quoting *In re Chester Water Authority Trust*, 263 A.3d at 705). For these reasons, DELCORA and Aqua posit that the trial court did not err in denying the County a writ of mandamus and issuing an injunction prohibiting the enforcement of the Ordinance.

After consideration of the parties' contentions, we find merit in the County's arguments.

Titled "[c]onveyance by authorities to municipalities or school districts of established projects," section 5622(a) of the MAA states as follows:

> (a) *Project.*--*If* a project established under this chapter by a board appointed by a municipality is of a character which the municipality has power to establish, maintain or operate and *the municipality desires to acquire the project, it may by appropriate resolution or ordinance adopted by the proper authorities signify its desire to do so, and the authorities shall convey by appropriate instrument the project to the municipality upon the assumption by the municipality of all the obligations incurred by the authorities with respect to that project.*

53 Pa.C.S. §5622(a) (emphasis added).

Here, in relevant part, the Ordinance provides as follows:

> Section 1.   *The County Council hereby directs and orders that [DELCORA] be terminated.*
>
> Section 2.   *[DELCORA] is directed and ordered to take all actions necessary to effectuate its termination, including, but not limited to, the following*:
>
> . . . .
>
> [Section] 2.02. [*DELCORA*] *shall* cooperate with the County in an orderly windup of its activities, and *take all steps necessary to effectuate the transfer of all of its assets, funds and other property,* including, as applicable, any

16

regulatory permits, to the County, *and the assumption of all of its liabilities by the County.*

. . . .

Section 8.     *The County Council [is] authorized to take any further action necessary to effectuate* the termination of [DELCORA], the removal of any impediments to such termination, [] and *the assumption of any liabilities of [DELCORA].*

Ordinance, §§1-2, 2.02, 8 (emphasis added).

As we explained in *In re Chester Water Authority Trust*, a municipality possesses the unilateral power under section 5622(a) to pass an ordinance mandating an authority that it had created to dissolve and transfer its assets to the municipality. In that case, the City, alone, created the Authority, and the Authority originally serviced the City, but later expanded to provide water service to other parts of Chester County and, also, Delaware County. Consistent with section 5610(a.1) of the MAA, *see supra* note 8, the City enlarged the governing body or "board" of the Authority to nine members, in order to account for, and more fairly represent, the areas outside its borders that received the services of the Authority. Ultimately, this Court held that, although section 5610(a.1) of the MAA reconfigured the representation on the board in charge of the Authority, to include members from outside the City, the City, as the sole municipal incorporator of the Authority, nonetheless retained the power granted to it by section 5622(a) of the MAA. In so doing, we reviewed and detailed our line of case law on the issue, originating in 1971 and reaffirmed throughout the years,[10] and determined "these cases demonstrate[] that, as a matter of law, section 5622(a) confers

---

[10] *See Township of Forks v. Forks Township Municipal Sewer Authority*, 759 A.2d 47 (Pa. Cmwlth. 2000); *Forward Township Sanitary Sewage Authority v. Township of Forward*, 654 A.2d 170 (Pa. Cmwlth. 1995); *Clearfield Borough v. Clearfield Borough Park Authority*, 285 A.2d 532 (Pa. Cmwlth. 1971), *aff'd*, 301 A.2d 372 (Pa. 1973) (*per curiam*).

17

upon a municipality, via a duly enacted ordinance, the power to dissolve an authority and obtain and later transfer and/or convey the authority's assets as it deems fit, without any input on the part of the authority." *In re Chester Water Authority Trust*, 263 A.3d at 700.

Clearly, the Ordinance dictated the termination/dissolution of DELCORA. *See* Ordinance, §§1-2, 2.02. While the parties dispute whether the Ordinance contained language wherein the County affirmatively and explicitly "assumed" the "obligations incurred" by DELCORA, at the very least, the Ordinance unambiguously required DELCORA, and authorized the County, to take the steps necessary for such an assumption. *See* Ordinance, §§2.02, 8. By its terms, the Ordinance thus acknowledges the absolute necessity for, and imperative nature of, an assumption of obligations, which is an event that would occur during (or in a sense, subsequent to) the time when DELCORA institutes its process of termination/dissolution, or, in other words, its "winding down" and the identification, itemization, or taking of inventory of its assets and obligations. Importantly, the process and procedure utilized by the County, as expressed in the Ordinance, is entirely consonant with section 5622(a) of the MAA. A municipality can initially order an authority to dissolve and transfer all its assets to the municipality, but, naturally, a municipality cannot direct the transfer of any specific assets until it can legally and officially verify the assets of an authority. Similarly, before the County can embark upon an "assumption . . . of all the obligations incurred by" DELCORA, the County must first acquire information regarding those obligations. 53 Pa.C.S. §5622(a).

Here, once the County ascertains and later obtains the transfer of DELCORA's assets and obligations, and technically assumes their ownership as a matter of law, the County can then demand, with an amendment to or creation of a new

18

ordinance, that DELCORA execute a legal instrument that officially conveys those assets and obligations as a matter of fact. *See Forward Township Sanitary Sewage Authority*, 654 A.2d at 175 (stating that "a municipality may, by ordinance, impose upon an authority the duty of executing the necessary documents for a transfer of all of the authority's property to its creating municipality"). Indeed, according to its structure, section 5622(a) of the MAA envisions—but does not necessarily require—a three-step process: first, a municipality enacts a resolution or ordinance to "signify" its "desire to acquire [a] project;" second, the municipality engages in measures to complete an "assumption . . . of all the obligations incurred . . . with respect to that project"; and, third, the authority "conveys[s] by appropriate instrument the project to the municipality." 53 Pa.C.S. §5622(a). The Ordinance is designed in such a way that mimics or otherwise complies with this process. Therefore, we conclude that the Ordinance is valid and enforceable to the extent it directs the termination/dissolution of DELCORA and dictates that, after termination/dissolution is underway, DELCORA must engage in conduct necessary to effectuate the transfer of its assets and the assumption of its liabilities/obligations by the County.

Citing its authority to enter into the APA with Aqua under section 5607(d)(4) and (13) of the MAA and claiming that the APA is a valid and enforceable contract, DELCORA questions whether the County could perform the obligations imposed by the APA. Likewise, Aqua, referring to the trial court's findings and determinations on the issue, asserts that the County, in the event it would assume the obligation of the APA, would breach the terms and conditions of the APA. Both DELCORA and Aqua contend that the County's inability to satisfactorily fulfill the obligation of the APA serves as an "impediment"—or a bar—to the County's exercise of power under section 5622(a) of the MAA.

19

In addressing these arguments, we find guidance in *In re Chester Water Authority Trust*. Notably, in concluding that "the City [of Chester] possesses the sole power under section 5622(a) of the MAA to demand and compel the conveyance of the Authority and its assets by enacting the appropriate resolution and/or ordinance," 263 A.3d at 706 , this Court commented upon former section 4B(d) of the 1945 MAA, now section 5607(d)(4) of the current MAA, which provided—and presently provides—an authority with the power "to sell, lease as lessor, transfer and dispose of any property or interest therein at any time acquired by it." *Formerly* 53 P.S. §306B(d); 53 Pa.C.S. §5607(d)(4). While expressly acknowledging that our General Assembly unmistakably granted an authority "the power to convey its property to another governmental entity," we stated, in relevant part:

> Nonetheless, just because an authority may transfer its assets to other governmental entities, as part of its daily operational affairs under [section 5607(d)(4)], this does not mean that an authority possesses the same and sole power under section 5622(a) of the MAA. Indeed, as a juxtaposition, the Supreme Court in *County of Allegheny*[ *v. Moon Township Municipal Authority*, 671 A.2d 662 (Pa. 1996)], clarified that, in contrast to [section 5607(d)(4)], section 5622(a) of the MAA was "applicable only to instances in which an authority's project is being transferred to the municipality or municipalities that actually created the authority." *County of Allegheny*, 671 A.2d at 665 (emphasis added). The Supreme Court further added that [section 5622(a)] was "presumably enacted to preclude a municipality . . . from assuming responsibility over projects absent a resolution or ordinance indicating the municipality's clear willingness to do so." *Id.* (emphasis added). Therefore, while *County of Allegheny* confirmed that *an authority may transfer or convey its assets to another governmental entity in the daily course of its business, it also reaffirmed that, assuming an authority does not want to transfer its assets to another authority or governmental entity, the creating and/or incorporating municipality, proceeding under [] section 5622(a) of the*

20

*MAA, can obtain the authority and its assets by passing an ordinance stating the municipality's desire to do so.*

*In re Chester Water Authority Trust*, 263 A.3d at 704-05 (emphasis added).

We find our reasoning in *In re Chester Water Authority Trust* equally applicable to the situation where an authority has expressed its desire to sell its assets, and has executed a contract to that effect, at least where, as here, the contract has not been fully performed. Reading section 5622(a) in tandem with section 5607(d)(4) and (13), it is apparent that section 5622(a) of the MAA presupposes that an authority has the power to enter contractual obligations, even with respect to a transfer of its assets, and expressly accounts for the scenario where the authority has already entered a valid and binding contract. That is, based on the plain language of section 5622(a) of the MAA, a municipality can "assume" all of the "obligations incurred" by an authority, including those in a contract to sell its assets, by obtaining an authority's project and legal title to the assets of the project. Otherwise, if an authority could override the power granted to a municipality in section 5622(a) by simply incurring contractual obligations, then the last clause of section 5622(a) would be rendered nugatory. *See* 53 Pa.C.S. §5622(a) (stating that "the authorities shall convey by appropriate instrument the project to the municipality upon the assumption by the municipality of all the obligations incurred by the authorities with respect to that project"). When analyzing statutory language, the courts "must give effect to every provision of the statute," *Pocono Mountain School District v. Department of Education*, 151 A.3d 129, 138 (Pa. 2016), and "[w]e are not permitted to ignore the language of a statute, nor may we deem any language to be superfluous." *Commonwealth v. McCoy*, 962 A.2d 1160, 1168 (Pa. 2009). Therefore, in order to give meaning to both section 5622(a) and section 5607(d)(4) and (13) of the MAA, and construe them in a harmonious fashion, we conclude that an authority may utilize its power to contract and sell its assets to

21

another entity; however, a municipality may invoke its power under section 5622(a) to demand that the authority terminate and/or convey its assets to the municipality at any time prior to the complete performance of that contract.

Moreover, a municipality's ability to perform the contractual obligations that it acquires from an authority is not an "impediment" recognized by the law where, as here, the authority has not obtained (and a municipality will thus not assume) any continuing "debt" or obligation that an authority has to repay, in what is basically financial installments, outstanding loans, or other forms of an immediate or continuing repayment obligation. *See Forward Township Sanitary Sewage Authority*, 654 A.2d at 175 (explaining that, absent a financial "impediment" imposed by another section of the MAA that pertains to debt securitization prior to dissolution, a county can dissolve an authority and demand conveyance of all its assets). That said, it is important to note that the County, in its demand that DELCORA terminate its operations and transfer its assets to the County, effectively places the County in a situation where it would receive a "contractual assignment" from DELCORA as a matter of statutory law. Consequently, the County would, without question or condition, be bound by the terms and conditions of the APA, just as if it were DELCORA itself in the sense that it would essentially become a "party" to a contract. *See Employers Insurance of Wausau v. Department of Transportation*, 865 A.2d 825, 830-31 (Pa. 2005). As such, all of the concerns that the trial court enunciated regarding the County's inability to fulfill the APA's contractual obligations is completely irrelevant and has no place in the statutory analysis of section 5622(a) vis-à-vis section 5607(d)(4) and (13) and the issue of whether the County retains its authority pursuant to section 5622(a) despite the APA and its specific obligations. This is because the County, irrespective of whether it can live up to the contractual promises made in the APA, will have no choice but to abide

22

by and fully perform its obligations or else be potentially subjected to a breach of contract suit by Aqua. *See Employers Insurance of Wausau*, 865 A.2d at 830-31.[11]

In sum, section 5622(a) provides the County with the authority to enact the Ordinance, and the Ordinance complies with the requisites necessary for the County to demand the termination of DELCORA and the conveyance of DELCORA's assets and obligations to the County.

**Conclusion**

For the above-stated reasons, we conclude that the trial court erred in denying the County's request for a writ of mandamus and granting injunctive relief in favor of DELCORA and Aqua. Accordingly, we reverse the trial court's order and remand to the trial court for the entry of an order consistent with this opinion. Due to the basis of and grounds for our disposition, we need not address the County's remaining arguments.

_____
PATRICIA A. McCULLOUGH, Judge

President Judge Cohn Jubelirer and Judges Covey, Fizzano Cannon and Wallace did not participate in this decision.

_____

[11] We express no opinion with respect to the viability of any potential remedies at law that Aqua and/or DELCORA may have in the event the County assumes the obligations of the APA.

23

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

| | | |
|---|---|---|
| County of Delaware, Pennsylvania,<br>Appellant | : | |
| | : | |
| | : | |
| v. | : | No. 148 C.D. 2021 |
| | : | |
| Delaware County Regional Water<br>Quality Control Authority, and<br>DELCORA Rate Stabilization Fund<br>Trust Agreement b/t The Delaware<br>County Regional Water Quality<br>Control Authority as Settlor and<br>Univest Bank and Trust Co. as<br>Trustee | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| Darby Creek Joint Authority, Southern<br>Delaware County Authority, and Aqua<br>Pennsylvania Wastewater, Inc. | : | |
| | : | |
| | : | |

## ***ORDER***

AND NOW, this 3rd day of March, 2022, the December 28, 2020 order of the Court of Common Pleas of Delaware County (trial court) is hereby REVERSED and the case is REMANDED to the trial court for entry of an order consistent with the accompanying opinion.

Jurisdiction relinquished.

_____
PATRICIA A. McCULLOUGH, Judge